FERENCY v SECRETARY OF STATE

Docket No. 129240. Submitted February 20, 1991, at Lansing. Decided July 22, 1991, at 9:55 A.M. Leave to appeal sought.

Zolton Ferency brought an action in the Ingham Circuit Court against the Secretary of State, seeking to have 1988 PA 275, which establishes a closed presidential primary election, declared unconstitutional and to enjoin the defendant from enforcing the act. The court, Thomas L. Brown, J., granted summary disposition for the plaintiff, holding that requiring a declaration of party preference at least thirty days before a presidential primary election and permitting the elector to vote only in the primary of the party declared were violative of the qualified-elector and secret-ballot provisions of the Michigan Constitution and the freedom of association provision of the United States Constitution, and that permitting an elector to vote for the candidates of only one political party in other partisan primary elections was an unconstitutional restriction on the rights of the elector. The defendant appealed.

The Court of Appeals *held:*

The circuit court erred in granting summary disposition for the plaintiff. The Legislature in creating a closed presidential primary election, by requiring a declaration of party preference at least thirty days before the election, did not impose a requirement inconsistent with the qualified-elector or secret-ballot provisions of the Michigan Constitution. The use of a closed presidential primary does not impermissibly infringe on the right of freedom of association guaranteed under the United States Constitution. The question of the propriety of requiring an elector to choose a party on entering the voting booth in nonpresidential partisan primary elections was not raised by the plaintiff and was not an issue properly before the trial court.

1. The question of the propriety of the requirements relating

REFERENCES

Am Jur 2d, Constitutional Law § 545; Elections §§ 4, 5, 9, 148, 150, 154, 158, 159.

See the Index to Annotations under Elections and Voting; Freedom of Association.

to nonpresidential partisan primary elections was not at issue, nor was resolution of that issue necessary in order to resolve the questions raised in the complaint. Accordingly, the circuit court lacked the authority to enter a judgment regarding the election law relating to nonpresidential partisan primary elections.

2. Because Const 1963, art 2, § 1, relating to qualified electors, is essentially the same as the 1908 Constitution that was deemed to permit legislative creation of a closed presidential primary election, and because the 1961 Constitutional Convention specifically considered the question of a constitutional provision dealing with a closed primary election, but rejected it in favor of leaving the question of a closed primary to the Legislature, there is clear evidence that the qualified-elector language was not intended to prohibit adoption of a closed primary election by the Legislature.

3. The same analysis of the history of the 1963 Constitution supports the conclusion that the secret-ballot provision of Const 1963, art 2, § 4 was not intended to preclude the adoption of a closed presidential primary. Further, requiring a declaration of political party preference does not violate the constitutional right of a secret ballot, because the right of secret choice of the particular candidate is secured, not destroyed, by the use of a closed presidential primary.

4. A closed primary election does not interfere with a person's freedom of association, but rather serves to insure that selection of a party's candidate is made by those who have openly expressed a desire to associate with the members of that political party.

Reversed.

MURPHY, J., concurring, stated that the presidential primary election at issue was not a regular election that places a person in public office, but is rather a mechanism used by political parties to select the candidate who will run for the office of President of the United States. Participants are not required to reveal for whom they vote, nor are they bound to a particular party in the regular election. Thus, their ballot remains secret, and there is no violation of Const 1963, art 2, §§ 1 or 4.

1. ELECTIONS — CLOSED PRESIDENTIAL PRIMARY ELECTIONS — CONSTI-
TUTIONAL LAW — QUALIFICATIONS OF ELECTORS.
The 1963 Michigan Constitution provision that every citizen who is twenty-one years of age, has resided in Michigan for six months, and meets local residency requirements as provided by law shall be a qualified elector was not intended to prohibit

legislative implementation of a closed presidential primary election (Const 1963, art 2, § 1).

2. ELECTIONS — CLOSED PRESIDENTIAL PRIMARY ELECTIONS — CONSTITUTIONAL LAW — SECRECY OF BALLOT.

The 1963 Michigan Constitution provision directing the Legislature to enact laws to preserve the secrecy of the ballot was not intended to prohibit legislative implementation of a closed presidential primary election; because the presidential primary election is principally a political party function, the requirement that one elect and declare an affiliation with a political party before the election does not violate the right of secrecy of the ballot (Const 1963, art 2, § 4).

3. ELECTIONS — CLOSED PRESIDENTIAL PRIMARY ELECTIONS — CONSTITUTIONAL LAW — FREEDOM OF ASSOCIATION.

A closed presidential primary does not violate a person's constitutionally protected freedom of association, but rather serves to protect freedom of association of the political parties and their members by insuring that only those who have expressed a desire to be associated with a particular political party will be permitted to participate in the selection of that party's presidential candidate.

Zolton Ferency, in propria persona.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Gary P. Gordon, Todd B. Adams,* and *Leo H. Friedman,* Assistant Attorneys General, for the defendant.

Amici Curiae:

*Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman* (by *Theodore Sachs*), for the Michigan Democratic Party.

*Foster, Swift, Collins & Smith* (by *David W. McKeague*), for the Michigan Republican Party.

Before: SAWYER, P.J., and HOOD and MURPHY, JJ.

SAWYER, P.J. Defendant appeals from an order granting summary disposition in favor of plaintiff pursuant to MCR 2.116(C)(10) and declaring uncon-

stitutional certain portions of the Michigan Election Law, MCL 168.1 *et seq.*; MSA 6.1001 *et seq.*, that deal with the conducting of presidential and general partisan primary elections. We reverse.

Plaintiff filed his complaint in circuit court, seeking to have declared unconstitutional 1988 PA 275, which establishes a closed presidential primary. Under the provisions of the act, in order to be eligible to vote in the presidential primary, a voter must declare, at least thirty days before the primary election, his party preference and may only vote in the presidential primary of the party for which the voter has declared a preference. A voter may change his preference anytime up to thirty days before a presidential primary, and the person's declaration is recorded in a public record. The trial court agreed with plaintiff and granted the relief sought.

Additionally, the trial court also declared MCL 168.576; MSA 6.1576 to be unconstitutional. That section governs the conducting of the ordinary, nonpresidential primary elections, normally held in August of even-numbered years.[1] In the August primary, a voter is restricted to voting in only one party's primary election, though there is no requirement that the voter publicly declare a party preference in advance of the election. Indeed, a voter does not select which primary to vote in until he enters the voting booth and that selection is secret. The voter's choice of a party preference with respect to the presidential primary has no effect on the August primary and voters who have not declared a party preference may nevertheless vote in the August primary. A voter may not, however, vote in the primary election of more

[1] We will hereinafter refer to these nonpresidential primary elections as the "August primary" for ease of reference, recognizing that these "August primaries" can be held at anytime of the year, such as where a special election is involved.

than one party in the same primary.[2] With respect
to the August primary, the trial court declared
unconstitutional the restriction on voting only
within one party's primary in any given election.
Under the trial court's order, voters would be
permitted to vote in both primaries during the
same August primary election.[3]

As the system presently exists, Michigan's presi-
dential primary can generally be referred to as a
"closed" primary because a person may vote in the
presidential primary only for a candidate for the
nomination of the party of which the voter has
publicly declared a preference at least thirty days
in advance of the election. The August primary, on
the other hand, can generally be described as an
"open" primary because, although the voter is
restricted to only voting in the primary of one
party, there is no obligation that the voter publicly
declare his party preference or that the voter vote
in the primary of the party with which he does
associate himself. Thus, the chairman of the Mich-
igan State Republican Party could legally vote in
the Democratic primary if he so desired, just as
the chairman of the Michigan State Democratic
Party could similarly vote in the Republican pri-
mary if that were his wish.

---

[2] E.g., a voter could not vote in the Republican primary for nomina-
tion of a candidate for Governor and in the Democratic primary for
selection of a nominee for United States Senator in the same August
primary. The voter, once having entered the booth, must choose to
either vote entirely within the Republican primary or entirely within
the Democratic primary.

[3] E.g., a voter could vote for a Republican candidate in the guberna-
torial primary and a Democratic candidate in the United States
senatorial primary. It is not clear from the trial court's opinion
whether defendant is compelled to allow a voter to vote in the
primaries of more than one party for the same elective office. That is,
to allow a voter to vote for both a Republican candidate and a
Democratic candidate in the gubernatorial primaries. The trial court's
order refers only to the requirement "that voters be allowed access
across party lines in primary elections . . . ."

Michigan has employed various primary schemes over the years, oscillating between open and closed primary elections. Most common in recent years has been the open primary election, both with respect to the August primary and the presidential primaries. However, in recent years the National Democratic Party has adopted rules which prohibit the recognition of delegates selected for the national presidential nominating convention on the basis of open primaries. As a result, the Democratic Party in Michigan did not participate in the open presidential primary, instead selecting its nominating delegates on the basis of party caucuses. With the demise of the presidential primary in Michigan, the Michigan Republican Party chose its candidates to its national nominating convention by way of a state convention, delegates to which were selected by the precinct delegates elected to party office in the August primary. 1988 PA 275 was passed in order to reestablish a presidential primary in Michigan, yet doing so in a manner that complied with the national rules of the Democratic and Republican Parties, particularly with respect to the requirement of the National Democratic Party that presidential primaries be closed.

Having put this case in some context, we proceed to consider the issues raised by defendant on appeal. First, we consider defendant's argument that the trial court exceeded its authority in declaring MCL 168.576; MSA 6.1576 unconstitutional. We agree. Plaintiff did not seek in his complaint, or any subsequent pleading, relief from the requirements of MCL 168.576; MSA 6.1576 with respect to the restrictions on voting in the August primary. Plaintiff sought relief only from the requirements relating to the presidential primary. Because the constitutionality of the provi-

sions of the election law with respect to the August primary was not before the court for decision, the trial court exceeded its authority in rendering such a ruling. Because no controversy existed concerning the propriety of the laws concerning the August primary, the court lacked the authority to enter a judgment concerning those provisions of the election law. See *Fieger v Comm'r of Ins,* 174 Mich App 467, 470; 437 NW2d 271 (1988).

Accordingly, that portion of the trial court's opinion that addresses the August primary, particularly MCL 168.576; MSA 6.1576, is vacated, and we may proceed in the remainder of this opinion to consider only the constitutionality of the presidential primary system enacted in 1988 PA 275. We shall analyze this question by first considering the purpose of requiring a closed primary and then separately addressing the three constitutional challenges to the closed presidential primary raised by plaintiff.

A closed primary seeks to have only individuals affiliated with a particular party vote in that party's primary for the purpose of selecting that party's nominee for a particular office. There are generally four classes of voters that closed primary statutes seek to prevent from voting in a particular party primary: (1) raiders—those associated with one party but who cross over to vote for a weak candidate in the rival party who is likely to lose to their own party's candidate in the general election (particularly if their own candidate is unopposed in the primary), (2) second-choice supporters—those associated with one party but who cross over to support a preferred candidate in the other party in case their own party's candidate loses in the general election, (3) crossovers—those affiliated with one party but who cross over to support a candidate in the other party whom they

prefer over any potential nominee of their own party, and (4) independents—those not affiliated with any party but who wish to support a particular party candidate. See *Smith v Penta,* 81 NJ 65, 70; 405 A2d 350 (1979). These voters are intentionally restricted from voting in the primary through the process of requiring them to announce a party allegiance in advance of the election.

We first turn to plaintiff's argument, which was accepted by the trial court, that 1988 PA 275 is unconstitutional because it adds a new qualification for voting not provided by the constitution as prohibited under Const 1963, art 2, § 1, which provides:

> Every citizen of the United States who has attained the age of 21 years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution. The legislature shall define residence for voting purposes.

Thus, the Legislature must allow every individual who meets the citizenship, residency, and age requirements of art 2, § 1 to vote.

Plaintiff argues that the requirement that a person declare a party preference constitutes an additional qualification to be an elector in contravention of this constitutional provision. Defendant argues that the Legislature was authorized to adopt a closed presidential primary under the provisions of Const 1963, art 2, § 4 authorizing the enactment of laws to preserve the purity of elections and to guard against abuses of the elective franchise. In particular, defendant argues that the closed presidential primary prevents the "evils" associated with the party caucus method, which

would be the alternative to a closed primary system.

On their faces, neither of the constitutional provisions cited by the parties directly address the issue of closed primaries. Rather, it is the interpretation given to those provisions that controls the determination in the case at bar. The primary rule of constitutional interpretation is the employment of original or common understanding. That is, What did the people understand the constitutional provision to mean when they adopted it? This principle, along with additional principles of constitutional construction, were discussed by the Supreme Court in *Traverse City School Dist v Attorney General,* 384 Mich 390, 405-406; 185 NW2d 9 (1971):

> This case requires the construction of a constitution, where the technical rules of statutory construction do not apply. *McCulloch v Maryland* [17 US (4 Wheat) 316, 407; 4 L Ed 579 (1819)].
>
> The primary rule is the rule of "common understanding" described by Justice Cooley:
>
> "A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.' [Cooley, Constitutional Limitations (6th ed), p 81]." (Emphasis added.)
>
> (See also quotations on "common understanding" in the *per curiam* opinion of the companion *Car-*

*man* [v *Secretary of State,* 384 Mich 443; 185
NW2d 1 (1971)] case, *supra.*)

A second rule is that to clarify meaning, the
circumstances surrounding the adoption of a con-
stitutional provision and the purpose sought to be
accomplished may be considered. On this point
this Court said the following:

"In construing constitutional provisions where
the meaning may be questioned, the court should
have regard to the circumstances leading to their
adoption and the purpose sought to be accom-
plished." *Kearney v Bd of State Auditors* [189
Mich 666, 673; 155 NW 510 (1915)].

A third rule is that wherever possible an inter-
pretation that does not create constitutional inva-
lidity is preferred to one that does. Chief Justice
Marshall pursued this thought fully in *Marbury v
Madison* [5 US (1 Cranch) 137; 2 L Ed 60 (1803)],
which we quote in part:

If any other construction would render the
clause inoperative, that is an additional reason for
rejecting such other construction . . . ."

See also *Livingston Co v Dep't of Management &
Budget,* 430 Mich 635, 642; 425 NW2d 65 (1988).

Thus, the question posed is whether the people
in adopting Const 1963, art 2, § 1 understood that
constitutional provision as including a prohibition
on the adoption of the closed primary system. For
the reasons to be discussed below, we conclude
that it does not and, therefore, Const 1963, art 2,
§ 1 does not prohibit the adoption of a closed
primary system.

It is, of course, impossible to divine what was in
the collective minds of the voters nearly three
decades ago when they adopted the 1963 Constitu-
tion, or the extent to which they deliberated over
each individual portion of the constitution. How-
ever, we can employ our best effort to resolve this
question by considering the text of the constitution
and the legal history in which the constitution was

written, as well as the debates of the delegates to the constitutional convention.[4]

We turn first to the state of the law preceding the drafting and ratification of the 1963 Constitution. As discussed above, between 1908 and 1963, Michigan employed both open and closed primaries at different times, though an open primary had been in use for some period of time before the drafting of the 1963 Constitution.[5] The important principle is that the 1908 Constitution neither established nor prohibited the use of a closed primary. Rather, the matter whether to employ an open or closed primary was left to legislative determination. Furthermore, the 1908 Constitution included the same qualifications to be an elector as are contained in the 1963 Constitution, namely, citizenship, residency, and age. Const 1908, art 3, § 1. Although these provisions were redrafted in the 1963 Constitution, including a somewhat more economical use of words, the provisions of Const 1963, art 2, § 1 concerning the qualifications of electors are essentially the same as those of the

[4] As Justice COOLEY pointed out in the passage quoted by the Supreme Court in *Traverse City School Dist,* it is the intent of the people who ratified the constitution, rather than the meaning ascribed by the delegates who framed the constitution, which ultimately resolves the issues of constitutional construction. *Id.,* p 405. This principle is discussed in greater detail in Bork, *The Tempting of America: The Political Seduction of the Law* (New York: The Free Press, 1990), p 144. Judge Bork explains that we can reach a determination of the original understanding of the ratifiers by looking to the words used and by looking to secondary materials, such as the debates at the conventions, public discussion, newspaper articles, dictionaries in use at the time of drafting, and the like. *Id.* With respect to interpreting our own Michigan Constitution, we would also add that consideration should be given to the preexisting constitution of 1908, as well as any court decisions before the framing of the 1963 Constitution and statutes enacted under the 1908 Constitution, to determine whether the delegates to the constitutional convention and, ultimately the people of Michigan, intended to change the law in the 1963 Constitution or merely intended that this particular aspect of government continue as it had been under the 1908 Constitution.

[5] Apparently, Michigan last changed from a closed primary to an open primary in 1937 under 1937 PA 37.

1908 Constitution. Thus, the text employed in the 1963 Constitution does not itself suggest an intent by the convention to draft a constitution that differed from the 1908 Constitution by inclusion of a prohibition against the use of a closed primary.

Further, as will be discussed below, the question of closed versus open primaries was, in fact, discussed at the 1961 Constitutional Convention, and had the intent of the convention been to place before the voters a constitution which prohibited closed primaries, the drafters certainly could have explicitly stated so in the text of the constitution. That is, faced with revising the 1908 Constitution under which Michigan had conducted both open and closed primaries, a fact of which the delegates to the 1961 Constitutional Convention were explicitly aware, it is certainly reasonable to expect that a convention determined to prohibit the utilization of closed primaries would have explicitly done so by including a provision to that effect rather than leaving it to the courts to divine such an intent from the utilization of language similar to that employed in the 1908 Constitution under which closed primaries were allowed. Rather, on the basis of the utilization in the 1963 Constitution of language similar to that contained in the 1908 Constitution, the more rational view is that it was the intent of the drafters, and ultimately the people in ratifying the 1963 Constitution, to leave the matter as it had existed under the 1908 Constitution, namely, at the considered discretion of the Legislature in enacting election laws.

The other readily available source for attempting to discern the common understanding of that constitutional provision is the debates during the constitutional convention itself. While the comments by individual delegates at the convention do not conclusively establish either the common un-

derstanding of the people in adopting the constitutional provision or, for that matter, the collective understanding of the delegates in adopting the provision, it is instructive to look at the debate in order to learn the intent of the drafters in accepting or rejecting particular proposals in the drafting of the constitution. At the constitutional convention, a substantial number of delegates supported a proposal to mandate a closed primary in the constitution, representing a change from the 1908 Constitution, which left the matter up to the Legislature. The proponents of the closed primary system not only advocated the desirability of closed primaries, but also expressed an unwillingness to leave the matter to the Legislature, having the view that the Legislature was unwilling, because of political considerations, to adopt a closed primary.[6]

The opponents of the closed primary proposal, in addition to voicing their views of the evils of a closed primary system, also frequently expressed the view that the issue is legislative in nature and that the issue is best left to the Legislature to resolve. Among the views expressed during the debate on the first closed primary proposal are the following:

> [*Mr. Pollock:*] Under the present constitution, the choice, of course, of the types of primary is a statutory matter. Unless we are convinced that one or the other type is better under all circumstances and at all times, it seems to me that we would be better advised to leave this in the hands of the legislature.

---

[6] See, e.g., the comments of Delegate Brake in support of the closed primary proposal, reporting that prior efforts to lobby the Legislature to adopt a closed primary were unfruitful because of the view of legislators that they needed crossover votes to win in the primary. 2 Official Record, Constitutional Convention 1961, p 2233.

\* \* \*

. . . I conclude, therefore, that it would be unwise to write into the constitution either the open or the closed primary, and I therefore urge the defeat of the amendment.

\* \* \*

[*Mr. Marshall:*] And if we are to adopt a closed primary, it seems that this is a matter that could better be left to the legislature at their discretion rather than try to write it into the constitution. I oppose the amendment.

\* \* \*

[*Mr. Wanger:*] . . . I urge you to vote no on this, first of all because the case for it, even as a legislative matter, has not been clearly established here on this convention floor; and secondly, because in any event, it is not a matter which should be frozen into the constitution.

\* \* \*

[*Mr. Pollock:*] [T]he committee thinks it simply unwise to write into the constitution either the open or the closed primary and therefore hope that you will defeat the amendment.

Apropos of Mr. Brake's comment that he realizes that this is a statutory matter, we've had so many violations of this principle as we've been grinding out this constitution, that if we continue to put statutory matter, I think, of a very minor sort such as this is, into the constitution, I suggest this week when we come to consider problems of legislative powers, that we just abolish the legislature and stay in session ourselves.

\* \* \*

[*Mr. Norris:*] And I think this matter ought to be left up to the legislature to see whether or not we can, in this state of ours, reach a state wherein there would be the hospitality, the acceptance, the encouragement of political difference, of political concepts, or political declaration of beliefs without public obloquy, and without economic coercion. . . .

\* \* \*

[*Mr. Yeager*:] [I]t was the subcommittee of the committee which took a look at it, namely, 3 members, and the chairman of that subcommittee stated to me that they turned it down as being legislative. [2 Official Record, Constitutional Convention 1961, pp 2233-2237.]

The proposal was defeated by a vote of fifty-five to sixty.

When the closed primary proposal was raised again later in the convention, the view that the closed primary issue is a legislative matter again was voiced, as a comment by Delegate Buback indicates:

I rise to oppose the Yeager amendment for the following reasons: in the first place, it is strictly a legislative matter and should not be in the constitution. [2 Official Record, Constitutional Convention 1961, p 2895.]

This time, the proposed amendment was defeated on a tie vote of fifty-eight to fifty-eight.

There was a third effort to incorporate a closed primary proposal in the constitution, which was again defeated, this time on a vote of fifty-five to seventy-one. Again, the debate in opposition to the proposal included the view that the matter was legislative in nature and should not be included in the constitution, as reflected by the comment of Delegate Wanger that there was nothing which could be more "patently legislative." 2 Official Record, Constitutional Convention 1961, p 3080.

What is also instructive from the record of the constitutional convention is that which was not debated and not proposed: that the constitution specifically prohibit a closed primary system. Although a number of delegates spoke eloquently in

opposition to the closed primary system, the convention did not adopt any proposal to prohibit closed primaries. Rather, the convention recognized that the 1908 Constitution left the matter to the Legislature, and the delegates at the 1961 convention were content to leave the matter as it was, namely, in the hands of the Legislature.

For the above reasons, we conclude that the text of Const 1963, art 2, § 1 does not support an interpretation that closed primaries are prohibited in Michigan, nor does the history of the drafting and ratification of the 1963 Constitution support any intent to interpret the clause so as to prohibit closed primaries. Rather, the record of the constitutional convention reflects an intent to maintain the status quo: that the matter was legislative in nature, and the constitution should require neither an open nor a closed primary. Finally, plaintiff presents no evidence to support the view that the common understanding of the people in adopting the 1963 Constitution was that the constitution would prohibit closed primaries. Rather, the only inference which can be drawn from the historical record is that the people, in adopting a constitution with provisions substantially similar to those of the 1908 Constitution, also intended to maintain the status quo, leaving the matter in legislative hands.

Next, we turn to plaintiff's argument that the closed presidential primary violates Const 1963, art 2, § 4, which, inter alia, directs the Legislature to enact laws to preserve the secrecy of the ballot. Plaintiff argues that ballot secrecy is violated by requiring voters to publicly declare their party affiliation in order to vote in the primary. We disagree.

First, much of the above discussion concerning the proposal to require a closed primary as part of

the constitutional convention debates is equally applicable here. That is, just as the facts that the 1908 Constitution did not require a closed primary, that a proposal to require a closed primary was explicitly rejected, and that no explicit proposal requiring an open primary was placed in the constitution reflect an intent by the drafters of the 1963 Constitution not to address the closed versus open primary debate as a matter of constitutional law in the drafting of Const 1963, art 2, § 1, so also do those facts reflect a similar intent in the drafting of Const 1963, art 2, § 4. The trial court's conclusion that the closed primary system violates the constitutional guarantee of secret ballot could be rejected on this basis alone. However, we shall nevertheless analyze the issue in more detail, because it is conceivable that the common understanding of the people in adopting the secret ballot clause would be to prohibit the necessity of public registration of party affiliation.

The requirement that a voter publicly register as being affiliated with one party or the other in order to be eligible to vote in the presidential primary does not itself directly affect the secrecy of the voter's ballot. That is, the voter is not required to disclose which individual candidate he is voting for, but is merely required to disclose from which group of candidates he is making his selection (i.e., which party primary he is voting in). The case relied upon by the trial court in concluding that the closed presidential primary violates the constitutional guarantee of secret ballots, *People ex rel Williams v Cicott*, 16 Mich 283, 311-313 (1868) (plurality opinion of Justice CHRISTIANCY), is not applicable in the case at bar. Although Justice CHRISTIANCY did refer to every voter being entitled to conceal his vote, including the person or party

for which he voted, that opinion did not deal with the issue of closed primary elections. Rather, it dealt with the propriety of conducting an inquiry into how the voters voted in order to resolve an election during which irregularities occurred, including situations where the total number of ballots cast exceeded the number of voters the poll lists reflect as having voted. The Court did not concern itself with the question whether a voter can be compelled to reveal which party primary he chooses to vote in.

Rather, we believe the better view was expressed by the California Supreme Court in *Katz v Fitzgerald,* 152 Cal 433, 435; 93 P 112 (1907):

> While primary election laws are now conducted under the law, and, are to that extent, a part of the elective system of the state, it is the secrecy of the ballot which the law protects, and not secrecy as to the political party with which the voter desires to act. The primary law does not prevent him from voting secretly. We cannot perceive where this law exposes any person advocating doctrines distasteful to any section of the community to its enmity any more than such a person would be exposed if he cast his ballot at a primary election held under the direction of the party managers without control of the law.

Although primary elections are run by the state and are regulated by the state election law, they nevertheless remain primarily party functions. That is, the purpose of a primary election for a partisan elective office is not to narrow the field of candidates down to two candidates who then run off in the general election (as is the case in primary elections for nonpartisan office). Rather, the purpose of the primary election for partisan offices is to select each major party's nominees for a

particular office.[7] See *Line v Bd of Election Canvassers of Menominee Co,* 154 Mich 329, 332; 117 NW 730 (1908) ("A primary election is not an election to public office. It is merely the selection of candidates for office by the members of a political party in a manner having the form of an election.")

In the general election, each party's candidates, along with any independent candidates, face each other for election to the office at issue. Similarly, in the presidential primary, the purpose of the primary election is to select delegates to the party's national convention for the purpose of conducting the business of the national party, including the nomination of that party's nominee for the office of President of the United States. Although the state has determined that it has an interest in controlling the nominations of candidates for partisan office, at least with respect to the major parties and certain offices,[8] this does not, however, change the fact that the primary election remains principally a party function.

If the focus of primary elections were not on the political parties and the selection of nominees for each party, then primaries would be held without respect to political parties and would serve merely as a method of narrowing the field of candidates down to two candidates for each office who would then face each other in the general November

[7] Political parties whose principal candidate received less than five percent of the total vote cast for candidates for the office of Secretary of State in the last preceding general state election are not permitted to make nominations by the primary election method. They are required to nominate by caucus or convention. MCL 168.532; MSA 6.1532.

[8] The primary election does not apply to all offices, but only those offices listed in MCL 168.534; MSA 6.1534. Certain offices, such as Lieutenant Governor, Attorney General, Secretary of State, justices of the Supreme Court, and the various elective educational boards are nominated in convention, even for the nominees of the major parties (i.e., those parties entitled to participate in the primary election).

election, much in the manner of how nonpartisan candidates are treated. Under such a system, the two candidates receiving the most votes in the primary would face each other in November without regard to their party affiliation. Thus, it might well be that two Democrats would face each other in the November election, or two Republicans would face each other, or a Democrat would face an independent, or a Republican would face a minor party nominee, or any such variation thereof.[9] Thus, the general November election does not consist of the two strongest candidates facing each other, but the strongest candidate from each party (plus independent candidates) facing each other. This indicates that party affiliation is not ancillary to the primary election process, but rather is the focus of the primary election. That is, the purpose of the primary is to select the strongest candidate from each party, not the two strongest candidates in the district without regard to party affiliation. Thus, primary elections are primarily party functions, unlike the general November election which merely serves to determine the candidate who appeals to the most voters and thus wins the office.

As for the presidential primary, the focus on the

---

[9] For example, in the 1988 August primary, in which three major parties participated (the Democratic Party, the Republican Party, and the Tisch Independent Party) in the Thirteenth Congressional District, there were three candidates vying for the Democratic nomination (Barbara Collins, George Crockett, and Michael Hartt) who received more votes in the primary than the candidate seeking the Republican nomination (John Savage, II). Michigan Manual 1989-1990, p 767. However, the two who received the most votes, Democrats Collins and Crockett, did not face each other in the general election. Rather, Democrat Crockett faced Republican Savage (and two minor party candidates) in the general election. *Id.* at 806. Similarly, in the same primary for the Forty-fifth State Representative District, the two candidates who received the most votes were Republicans, yet the top Republican candidate in the primary faced off against the lone Democrat candidate in the primary in the general November election. *Id.,* pp 777, 834.

party aspect is even stronger. The voters in a presidential primary do not merely cast votes for each party's nominee for President, but also influence the selection of delegates to the party's national convention, who in addition to selecting that party's nominee for President conduct other party business, such as the drafting of a platform and the drafting of party rules. Thus, a party has legitimate concerns with raiding, not only in terms of the possibility of having a nominee that does not share that party's political philosophy, but also in terms of the possibility of the selection of delegates who could draft a party platform in contravention to the party's general philosophy as well as establish party rules which could effectively wrest control of the party away from the party regulars and put it in the hands of the raiders.

Accordingly, we conclude that the California Supreme Court in *Katz* was correct in concluding that primaries remain primarily party functions and thus there is a legitimate state interest in restricting access by voters to the primary elections and, more to the point, in requiring voters to publicly identify their party affiliation in order to be eligible to vote in a primary election. That is, because primary elections are primarily party functions, it is not unreasonable to expect the voter to be willing to disclose his party affiliation in order to participate in that party's internal operations, such as the selection of its nominee for a particular office. This does not violate the secrecy of the ballot, because there is no legitimate interest by the voter to shield his affiliation from a party where that voter decides to participate in the party activities and where the ballot remains secret once the voter gets in the primary election booth.

Moreover, we note that the alternative to the

closed presidential primary is not holding an open presidential primary. As history has demonstrated, at a minimum, the Democratic Party refuses to participate in an open primary, for entirely legitimate reasons, and would refuse to seat at its national convention any delegation from Michigan chosen through an open primary process. Rather, the rules of the national Democratic Party would require, in the absence of a closed presidential primary, that the Michigan Democratic Party select its national convention delegates through a caucus system. While we are not informed of the precise method by which the Democrats conduct their caucus system, clearly it would necessitate a person attending a Democratic caucus and thus publicly exposing himself to identification as a Democrat.

Furthermore, because the caucuses would be beyond the control of the Secretary of State, and state election law, there would be no guarantee that the caucuses would be run using a secret ballot. That is, while the Democratic Party could choose to conduct its caucuses by secret ballot, it could as easily choose to require each caucus participant to publicly announce his vote during the caucus, because the running of the caucus would be subject to party rules rather than state election law. Similarly, the Republican Party, which historically has selected its national convention delegates in state convention in the absence of the presidential primary, would be under no compunction to require the use of a secret ballot in selecting the delegation members and might require each state convention delegate to publicly announce which presidential candidate he was supporting. Thus, from the standpoint of a secret ballot, we fail to see how striking down the closed presidential primary would support this aim.

Rather, striking down the presidential primary statute would seem to have the effect of weakening the sanctity of the secret ballot rather than strengthening it.

For the above reasons, we conclude that the presidential primary statute, 1988 PA 275, does not violate the secret ballot requirements of the state constitution, Const 1963, art 2, § 4.

Next, we turn to plaintiff's argument that the closed presidential primary violates the right of association. In finding that the closed presidential primary, as well as the restricted open August primary, violates this constitutional right, the trial court relied upon the United States Supreme Court decision in *Tashjian v Republican Party of Connecticut,* 479 US 208; 107 S Ct 544; 93 L Ed 2d 514 (1986). However, *Tashjian* does not support the trial court's conclusion. In *Tashjian,* the State of Connecticut had a closed primary system in which a voter must register as a member of a particular party in order to vote in that party's primary. However, the Republican Party of Connecticut changed its party rules to allow any voter who was either a registered Republican or was a registered voter not affiliated with any party to participate in the Republican primary. However, Connecticut election law did not allow for independents to participate in a party primary. The United States Supreme Court concluded, in essence, that the Connecticut Republican Party had the right to associate with those voters it wished, including independent voters. Thus, the holding of *Tashjian* is that the state cannot restrict participation in a party primary by those voters whom the party wishes to have participate. Thus, *Tashjian* would be applicable if either the Democratic or Republican Party wished to allow independents to participate in its presidential primary but those indepen-

dents were not allowed to do so under state election law.

In fact, the closed presidential primary does not impede any voter's freedom of association with a political party. Any voter is lawfully entitled to associate with any political party and participate in any major political party's presidential preference primary by merely publicly declaring party affiliation as part of the voter registration process. Moreover, a challenge based on a freedom of association argument to New York's closed primary system, in which the requirement that party registration occur several months before a primary was held, was rejected by the United States Supreme Court in *Rosario v Rockefeller,* 410 US 752; 93 S Ct 1245; 36 L Ed 2d 1 (1973). The Supreme Court concluded that a voter's freedom of association was not impeded because the voter could register as a member of a political party, though the voter was required to do so several months in advance of the primary election.

In fact, the freedom of association, rather than supporting plaintiff's position, defeats plaintiff's position inasmuch as the political parties, and their members, are entitled to closed primaries in order to protect their own associational rights. This principle was upheld in *Nader v Schaffer,* 417 F Supp 837 (D Conn, 1976), in the upholding of Connecticut's closed primary system. This principle was also explicitly recognized by the United States Supreme Court in *Democratic Party of the United States of America v Wisconsin ex rel La Follette,* 450 US 107, 122; 101 S Ct 1010; 67 L Ed 2d 82 (1981):

> And the freedom to associate for the "common advancement of political beliefs," *Kusper v Pontikes* [414 US 51, 56; 94 S Ct 303; 38 L Ed 2d 260

(1973)], necessarily presupposes the freedom to identify the people who constitute the association and to limit the association to those people only.[22] "Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy v New Hampshire* [354 US 234, 250; 77 S Ct 1203; 1 L Ed 2d 1311 (1957)]; see *NAACP v Button* [371 US 415, 431; 83 S Ct 328; 9 L Ed 2d 405 (1963)].

Here, the members of the National Party, speaking through their rules, chose to define their associational rights by limiting those who could participate in the processes leading to the selection of delegates to their National Convention. On several occasions this Court has recognized that the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions—thus impairing the party's essential functions—and that political parties may accordingly protect themselves "from intrusion by those with adverse political principles." *Ray v Blair* [343 US 214, 221-222; 72 S Ct 654; 96 L Ed 894 (1952)].

---

[22] "Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." L. Tribe, American Constitutional Law 791 (1978).

---

See also *Cousins v Wigoda,* 419 US 477; 95 S Ct 541; 42 L Ed 2d 595 (1975); *Ferency v Austin,* 666 F2d 1023 (CA 6, 1981).

Thus, the freedom of political association supports the use of a closed primary where a political party desires a closed primary in order to protect the associational rights of the party and its members. Rather than the principles of the freedom of association compelling an open primary, regardless of party wishes, it is the party's choice to determine with whom it wishes to associate and, there-

fore, whether its interests require a closed or an open primary, or a semi-open primary as was the case in *Tashjian.*

For the above reasons, we conclude that the trial court was incorrect in its determination that 1988 PA 275 is constitutionally infirm under each of the theories proffered by plaintiff and relied upon by the court. Rather, the Legislature is empowered to create a closed primary consistent with the state and federal constitutions.

Reversed. Defendant may tax costs.

HOOD, J., concurred.

MURPHY, J. *(concurring).* I concur that the trial court erred in declaring MCL 168.576; MSA 6.1576 to be unconstitutional, because the issue of its constitutionality was not a controverted issue before the court, nor was the determination of its constitutionality germane to the determination of the constitutionality of 1988 PA 275. The closed primary election at issue is not a regular election that places a person in public office, but rather a mechanism used by the political parties to select their candidates for the office of President of the United States. Participants are not required to reveal for whom they vote, nor are they bound to a particular party in the regular election. Thus, their ballot remains secret. Accordingly, I find no violation of Const 1963, art 2, § 1 or § 4. Finally, I concur with the majority opinion's reasoning that 1988 PA 275 does not unreasonably infringe on an individual's constitutional right of association.

I would reverse the decision of the trial court, but would not award costs to either party, because a public question is involved.