GREBNER v STATE OF MICHIGAN

Docket No. 281814. Submitted November 15, 2007, at Lansing. Decided
    November 16, 2007, at 9:00 a.m. Reversed and remanded to the
    circuit court, 480 Mich 939.

Mark L. Grebner and others brought an action in the Ingham Circuit
    Court against the state of Michigan and the Secretary of State,
    alleging, in part, that the provisions of 2007 PA 52, which require
    the Secretary of State to provide only to the political parties that
    participate in the January 15, 2008, presidential primary election
    a list of those who voted and which participating political party's
    ballot was selected by each voter, unconstitutionally appropriates
    public property for private use and violates the Purity of Elections
    Clause, Const 1963, art 2, § 4. The court, William E. Collette, J.,
    determined that 2007 PA 52 is unconstitutional and restrained
    and enjoined the Secretary of State from conducting the primary
    election. The defendants brought an emergency application for
    leave to appeal and motions to stay the lower court's order or, in
    the alternative, to reverse or vacate the order.

    The Court of Appeals *held*:

    Leave to appeal and the motion for a stay must be denied.

    1. The act clearly appropriates public property for private
purposes. The lists are public property and the primary purpose of
providing them to the political parties is a private one. The act is
unconstitutional because it was not assented to by two-thirds of
the members elected to and serving in each house of the Legisla-
ture as Const 1963, art 4, § 30 requires for the appropriation of
public money or property for local or private purposes.

    2. The plaintiffs have standing to bring this action. Certain
plaintiffs filed affidavits indicating that they owned property
assessed for direct taxation in accordance with MCR
2.201(B)(4)(b). The plaintiffs also satisfied the constitutional ele-
ments for standing identified in *Rohde v Ann Arbor Pub Schools*,
479 Mich 336 (2007).

    Leave to appeal and motion for stay denied.

    Chief Judge WHITBECK, dissenting, stated that 2007 PA 52 is an
appropriation bill that does not contain an appropriation of public
money but does contain an appropriation of public property.

However, such appropriation serves a public purpose, given that the appropriation will lead to public debate on the qualifications of candidates, which is integral to the operation of our system of government, and to a discussion of ballot proposals, which serves to enlighten the public and encourage informed decision-making. The act does not affect the purity of elections in the absence of evidence that the political parties will use the lists to disadvantage any candidate. The order of the lower court should be vacated and the motion for stay, application for leave to appeal, and motion to waive the requirements of MCR 7.209(A)(2) and (3) should be denied because they are moot.

*Bodwin & Stover, P.C.* (by *Randolph L. Bodwin* and *James C. Wright*), for the plaintiffs.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Patrick O'Brien* and *Heather S. Meingast*, Assistant Attorneys General, for the defendants.

Amicus Curiae:

*Foster, Swift, Collins & Smith, P.C.* (by *Eric E. Doster*), for the Michigan Republican Party.

Before: METER, P.J., WHITBECK, C.J., and OWENS, J.

METER, P.J. In this case involving the constitutionality of 2007 PA 52 (the act), defendants request that we grant leave to appeal and reverse the order of the lower court that granted plaintiffs' motion for preliminary injunctive relief, deemed the act unconstitutional as a matter of law, and enjoined defendants from conducting the January 15, 2008, presidential primary election. Alternatively, defendants request that we grant leave to appeal and stay the lower court's order pending the outcome of the appeal. We deny leave to appeal and, necessarily, the motion for stay.

The facts of this case are aptly set forth in Chief Judge WHITBECK's dissenting opinion and we see no need to reiterate them here. Moreover, we concur in Chief Judge WHITBECK's conclusion that the act appropriates public property. We disagree, however, with his analysis concerning whether the act appropriates public property "for . . . private purposes." See Const 1963, art 4, § 30.[1] In our view, the act clearly does appropriate the lists in question "for . . . private purposes."

In *Falk v State Bar of Michigan*, 411 Mich 63, 153; 305 NW2d 201 (1981), the petitioner challenged the use of mandatory bar dues "for sponsoring Lawyer Referral, Prepaid Legal Services, Lawyer Placement and the Client Security Fund . . . ." He argued that the expenditures were for private purposes and were not authorized in accordance with Const 1963, art 4, § 30. *Falk, supra* at 153. Justice WILLIAMS, joined by Chief Justice COLEMAN, opined as follows:

> As to the first argument that the expenditure of Bar funds for the challenged activities is not for a public purpose we note that petitioner's analysis of the purpose of the Bar program is inadequate. Except perhaps for the Lawyer Placement Service, none of the programs were instituted nor are presently conducted primarily for the benefit of attorneys even though, admittedly, some attorneys may benefit incidentally. Lawyer Referral and Prepaid Legal Services were created in order to make legal services more accessible to "that segment of the population, which studies have shown runs roughly around 70 percent, who do not consult lawyers for one reason or another, partly out of fear of the unknown and of how much lawyers would charge" (testimony of Michael Franck, Executive Director of the Michigan State Bar). . . . Similarly the purpose of the

---

[1] As noted in Chief Judge WHITBECK's dissenting opinion, this section states: "The assent of two-thirds of the members elected to and serving in each house of the legislature shall be required for the appropriation of public money or property for local or private purposes."

Client Security Fund is not to insure attorneys for malpractice but to protect the public by reimbursing victims of a defalcation either by clients of lawyers or by a lawyer acting in a fiduciary capacity. Therefore Lawyer Referral, Prepaid Legal Services and the Client Security Fund clearly constitute a permissible public service, rather than a private or local service, within the meaning of Const 1963, art 4, § 30. [*Falk, supra* at 154-155.]

Unlike the programs discussed by Justice WILLIAMS, providing the lists at issue here to political parties[2] does not serve some overriding public purpose while benefiting private individuals "incidentally." In fact, we believe that the converse is true. Providing the lists to political parties primarily serves the parties' interests in promoting their own agendas, even though members of the public may benefit incidentally by obtaining certain types of political information that may aid them in, for example, making election choices.

Chief Judge WHITBECK places a great deal of emphasis on *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10)*, 396 Mich 465; 242 NW2d 3 (1976). We do not find that opinion controlling. As noted by Chief Judge WHITBECK, in *Advisory Opinion*, the Supreme Court analyzed whether a statute providing for certain state funding of gubernatorial elections constituted an appropriation for private purposes within the meaning of Const 1963, art 4, § 30. *Advisory Opinion, supra* at 495-497. The Court quoted the following statement from *Gregory Marina, Inc v Detroit*, 378 Mich 364, 394; 144 NW2d 503 (1966):

"[D]etermination of what constitutes a public purpose involves considerations of economic and social philosophies and principles of political science and government. *Such*

---

[2] We agree with Chief Judge WHITBECK's conclusion that political parties are private entities.

*determinations should be made by the elected representa-
tives of the people."* [*Advisory Opinion, supra* at 496 (em-
phasis added).]

We do not find this statement particularly helpful,
because the Legislature *did not make a determination*
regarding whether providing the lists to political parties
serves a public purpose. In our view, it is a stretch to
infer that the Legislature viewed the process as serving
a public purpose simply because they believed the act
would be valid without the assent of two-thirds of the
members of each house of the Legislature.

The *Advisory Opinion* Court also cited *Gaylord v
Gaylord City Clerk*, 378 Mich 273, 299-300; 144 NW2d
460 (1966), in stating that "[t]he question is whether
society at large has an interest in having [certain]
individuals benefited." *Advisory Opinion, supra* at 496.
An examination of *Gaylord* reveals that the proposition
in question was derived originally from the Massachu-
setts case of *Allydonn Realty Corp v Holyoke Housing
Auth*, 304 Mass 288, 293; 23 NE2d 665 (1939), and was
but one of a long list of factors the *Allydonn* court listed
as being relevant to determining whether a service is
"public." We do not view the *Allydonn* statement as the
ultimate litmus test for whether a statute serves a
public purpose. Indeed, using that statement as the
ultimate litmus test could potentially lead to absurd
results. A statute authorizing public funds to build a
shopping mall, for example, could be deemed as having
a public purpose because "society at large" might have
"an interest" in the increased tax revenues and the
convenience provided by the mall.

The act states that

[a] participating political party may only use the informa-
tion transmitted to the participating political party . . . to
support political party activities by that participating po-

litical party, including, but not limited to, support for or opposition to candidates and ballot proposals. [2007 PA 52, § 615c(8).]

"Society at large" might have *some* interest in providing the political parties with access to information concerning which political party's ballot an elector at the presidential primary selected, in that perhaps the political parties will be better able to communicate with potential voters about certain issues or candidates. However, in our view, it is abundantly clear that the primary purpose of providing the lists is a private one: "support[ing] political party activities by . . . participating political part[ies]." *Id.* Providing the lists to political parties allows them to further their private agendas by specifically targeting individuals who have expressed a potential affiliation with a particular political party.

Defendants contend that providing the lists to political parties somehow serves a public purpose by preventing "raiding" and "cross-over voting," i.e., by preventing individuals voting in the primary election from selecting the ballot of a party with which they do not truly identify. It is unclear to us, however, how the act prevents such voting, other than through the implicit threat that the parties will eventually be able to discern if a particular voter did participate in "cross-over voting." Defendants' argument is tenuous and unpersuasive.

The act "appropriat[es] . . . public . . . property for . . . private purposes" and is therefore unconstitutional because it was not assented to by "two-thirds of the members elected to and serving in each house of the legislature . . . ." Const 1963, art 4, § 30.

We briefly address defendants' argument that plaintiffs lacked standing to sue. Certain plaintiffs filed affidavits indicating that they owned property "assessed for direct taxation" in accordance with MCR

2.201(B)(4)(b). Plaintiffs also satisfied the constitutional elements for standing identified in *Rohde v Ann Arbor Pub Schools*, 479 Mich 336, 348; 737 NW2d 158 (2007). They sufficiently alleged an imminent, likely, and particularized injury in fact. Finally, we reject defendants' argument that plaintiffs' complaint did not sufficiently allege a pertinent cause of action under Const 1963, art 4, § 30.

We deny leave to appeal and, necessarily, the motion for stay. We also grant the motion to waive the requirements of MCR 7.209.

Owens, J., concurred.

Whitbeck, C.J. (*dissenting*). I respectfully dissent. In this case, defendants state of Michigan and Secretary of State Terri Lynn Land move (1) for a stay of the lower court's November 9, 2007, order granting the motion of plaintiffs Mark L. Grebner and others (the Grebner plaintiffs) for preliminary injunctive relief, and (2) for a grant by this Court of their emergency application for leave to appeal. In the November 9 order, the lower court determined 2007 PA 52 to be unconstitutional as a matter of law, and restrained and enjoined the Secretary of State and her agents from conducting the January 15, 2008, presidential primary election. In the alternative and, in lieu of a stay, the Secretary of State moves that this Court reverse or vacate the lower court's November 9 order. I would vacate the November 9, 2007, order.

## I. OVERVIEW

This case concerns 2007 PA 52 (the act). The act has attracted widespread attention because, among other

things, it sets January 15, 2008, as the date for the Michigan presidential primary in that presidential election year. The lower court determined certain provisions of the act to be unconstitutional. Because the act contains a nonseverability clause, the lower court was obligated to declare the act unconstitutional in its entirety. Thus, if the lower court ruling stands, Michigan will not hold a presidential primary on January 15.

But, I emphasize, the application for leave to appeal before this Court relates to the upcoming presidential primary *solely* because of the nonseverability provision of the act. The chief substantive question before this Court relates only tangentially to the presidential primary. The main substantive question that I address in this dissenting opinion concerns information to be compiled by city and township clerks in the form of a separate record at the presidential primary that includes the political party ballot selected by an elector at the presidential primary. The local clerks are to submit this information to the Secretary of State and she, in turn, is to provide this information to the chairperson of each "participating political party." At this time, only the Democratic and the Republican parties qualify as participating political parties.

Importantly, the collected information is confidential, exempt from disclosure under the Freedom of Information Act[1] and is not to be disclosed, with only certain exceptions, to any person for any reason. Because of these provisions, the substantive question that this Court must decide is whether the procedure for compiling and providing this information constitutes the appropriation of public property for a private pur-

---

[1] MCL 15.231 *et seq.*

pose. The reason that this Court must decide this question is that the 1963 Michigan Constitution provides:

> The assent of two-third of the members elected to and serving in each house of the legislature shall be required *for the appropriation of public money or property for local or private purposes.*[2]

The parties agree that the Legislature did not pass the act with the requisite two-thirds majority of each house. Thus, the constitutional question is squarely before this Court. While I recognize that this Court could also decide this case on other grounds—including standing, the harm to the public interest, the balancing of harm to the applicants (here, the Grebner plaintiffs) versus harm to the opposing parties (here, the state and the Secretary of State), and irreparable injury—I would address the substantive constitutional issue because I believe it to be determinative.

In addressing the constitutional issue, I have broken down the language of Const 1963, art 4, § 30. First, I have considered whether the act is an "appropriation bill," and I would conclude that it is. Secondly, I have considered whether the act contains an appropriation of public money, and I would conclude that it does not. Third, I have considered whether the act contains an appropriation of public property, and I would conclude that it does. Fourth, and finally, I have considered whether the act contains an appropriation of public property for private purposes, and I would conclude that it does not. I would also conclude that the act does not affect the purity of elections. Accordingly, I would conclude that the lower court's issuance of an injunction was an abuse of discretion and would vacate the lower court's November 9, 2007, order.

---

[2] Const 1963, art 4, § 30 (emphasis added).

## II. BASIC FACTS AND PROCEDURAL HISTORY

### A. THE ACT

#### (1) THE PRESIDENTIAL PRIMARY

The Legislature adopted the act on August 30, 2007. The Governor approved the act on September 3, 2007, and its effective date is September 4, 2007. The act amended the Michigan Election Law[3] to provide, among other things, for a presidential primary to be held on January 15, 2008, for that presidential election year only.[4] In any following presidential election year, the presidential primary is to be held on the fourth Tuesday in February.[5]

As the Secretary of State points out, the act reinstituted a "closed" primary system for Michigan. Under the act, in order to vote in a presidential primary in Michigan, an elector must indicate which "participating political party" ballot that elector wishes to vote when appearing to vote at the presidential primary.[6] The act defines a "[p]articipating political party" as "a political party authorized to participate in a presidential primary under section 613a."[7] The act provides that "[a] political party that received less than 20% of the total vote cast in this state for the office of president in the last presidential election shall not participate in the presidential primary."[8] According to the Secretary of State, at this time, only the Michigan Democratic Party and the Michigan Republican Party are qualified to

---

[3] MCL 168.1 *et seq.*

[4] 2007 PA 52, § 613a(1).

[5] *Id.*

[6] *Id.* at § 615c(1).

[7] *Id.* at § 19(a).

[8] *Id.* at § 613a(3).

participate in the presidential primary process under the act. Both the Democratic Party and the Republican Party have elected to participate in the January 15, 2008, Michigan presidential primary.

### (2) THE LISTS

In addition to other duties, the act requires city and township clerks, under procedures developed by the Secretary of State, to keep a separate record at the presidential primary that contains the printed name, address, and qualified voter file number of each elector and, importantly for this case, the "participating political party ballot selected by that elector at the presidential primary."[9] The Legislature directed the Secretary of State to create and implement the qualified voter file over 10 years ago.[10] Thus, what is at issue in this case is not the qualified voter file itself, but rather the addi-

---

[9] *Id.* at § 615c(3).

[10] MCL 168.509*o* provides as follows:

(1) The secretary of state shall direct and supervise the establishment and maintenance of a statewide qualified voter file. The secretary of state shall establish the technology to implement the qualified voter file on or before January 1, 1997. The qualified voter file shall be the official file for the conduct of all elections held in this state on or after January 1, 1998. The secretary of state may direct that all or any part of the city, township, or village registration files shall be used in conjunction with the qualified voter file at the first state primary and election held after the creation of the qualified voter file.

(2) Notwithstanding any other provision of law to the contrary, beginning January 1, 1998, a person who appears to vote in an election and whose name appears in the qualified voter file for that city, township, village, or school district is considered a registered voter of that city, township, village, or school district under this act.

(3) The secretary of state, a designated voter registration agency, or a county, city, township, or village clerk shall not place a name of an individual into the qualified voter file unless that

tional information that the act requires to be collected concerning the ballots selected by electors who vote, at this time, in the Democratic or Republican party presidential primary election in Michigan.

The act requires that the local clerks submit this information to the Secretary of State by a deadline that she is to establish.[11] The Secretary of State, within 71 days after the presidential primary, must then "provide to the chairperson of each participating political party a file of the records for each participating political party" as kept and submitted by the local clerks.[12] Except for this disclosure to the party chairpersons, this information (the lists) is "confidential," "exempt from disclosure under the freedom of information act," and not to "be disclosed to any person for any reason."[13] However, a participating political party may use the lists

> to support political party activities by that participating political party, including, but not limited to, support for or opposition to candidates and ballot proposals. A participating political party may release the information transmitted to the participating political party under subsection (6) to another person, organization, or vendor for the purpose of supporting political party activities by that participating political party, including, but not limited to, support for or opposition to candidates or ballot proposals.[14]

But the act also limits the purposes for which the participating political parties may use the lists:

> person signs an application as prescribed in section 509r(3). The secretary of state or a designated voter registration agency shall not allow a person to indicate a different address than the address in either the secretary of state's or designated voter registration agency's files to be placed in the qualified voter file.

[11] 2007 PA 52, § 615c(6).

[12] *Id.*

[13] *Id.* at § 615c(4).

[14] *Id.* at § 615c(8).

> Except as provided in subsection (8), a participating
> political party shall not use the information transmitted to
> the participating political party under subsection (6) indi-
> cating which participating political party ballot an elector
> selected at a presidential primary for any purpose, includ-
> ing a commercial purpose, and shall not release the infor-
> mation to any other person, organization, or vendor.[15]

In short, at this time, the Democratic and Republican
parties and persons with whom they contract[16] can use
the lists to support political party activities, including,
without limitations, supporting or opposing "candi-
dates" and "ballot proposals," but for no other purpose.
According to the act, providing the lists to the chairper-
son of each participating political party is done "[t]o
ensure compliance with the state and national political
party rules of each participating political party and this
section . . . ."[17]

### (3) NONSEVERABILITY CLAUSE

Enacting § 1 of the act provides as follows:

> If any portion of this amendatory act or the application
> of this amendatory act to any person or circumstances is
> found invalid by a court, it is the intent of the legislature
> that the provisions of this amendatory act are nonseverable
> and that the remainder of the amendatory act shall be
> invalid, inoperable, and without effect.

### B. THE COMPLAINT

On October 24, 2007, the Grebner plaintiffs filed
their complaint in this matter. The complaint described
the noncorporate plaintiffs as taxpayers and as resi-

---

[15] *Id.* at § 615c(7).

[16] *Id.* at § 615c(9).

[17] *Id.* at § 615c(5).

dents of various cities and counties in Michigan. The complaint described plaintiff Berl N. Schwartz as the publisher of the *Lansing City Pulse*. The complaint described plaintiff Practical Political Consulting, Inc., as a duly authorized Michigan corporation.

In their common allegations, the Grebner plaintiffs asserted that the unique facts and circumstances of this matter "have never arisen anywhere before in the United States rendering this matter a case of first impression." The common allegations described the qualified voter file as a "computerized file of Michigan's registered voters" that the Secretary of State compiles and maintains at public expense and that, as public information, a copy of which "should be freely available to any member of the public for a nominal fee." The complaint went on to describe the lists that the act requires to be created as "secret records." The complaint asserted that the lists "would be worth several million dollars to each of the participating political parties."

In count I of the complaint, the Grebner plaintiffs asserted that the qualified voter file and the lists are public property and that the act gives participating political parties "substantial economic benefits not available to other people, entities, and/or taxpayers." The Grebner plaintiffs went on to assert that the lists are trade secrets under Michigan law.[18] The gist of count I was that the act unconstitutionally appropriates public property for private use.

In count V of the complaint, the Grebner plaintiffs asserted that Const 1963, art 2, § 4 requires the Legislature to enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, and to guard

---

[18] MCL 445.1901 *et seq.*

against abuses of the elective franchisee. The Grebner plaintiffs went on to assert that the "coercive nature of this Act pollutes the purity of Michigan's elections and abuses the election franchisee for the sole benefit of the two non-taxpaying so-called 'major' political parties." The gist of count V was that the act unconstitutionally requires the Secretary of State to violate her duty to safeguard the purity of elections.

The Grebner plaintiffs also asserted that the act unconstitutionally defines a vague speech crime with the ambiguous terms of "use" and "information" (count II), that the act infringes on protected rights of free speech (count III), and that the act involves the corrupt diversion of public assets (count IV). The lower court did not rule on these assertions; thus, I do not consider them further.

### C. THE LOWER COURT'S RULING

The parties submitted briefs, and the lower court held a hearing in this matter on November 7, 2007. At the conclusion of the hearing, the lower court first ruled that the Grebner plaintiffs had standing to bring this action. The lower court then said:

> It is my view that the property in question here is publicly owned property and amassed at public expense, maintained at public expense, and only distributed—and actually distributed at public expense to third parties. And as such, you need a two-thirds vote of the legislature to in fact enact such a law, which was obviously not done in this particular case.
>
> Secondly, the Court is of the opinion that to maintain this information in the manner in which it is being maintained, and not making it available to other people, clearly, in my view, infringes upon the right for a free and fair election under the rights under Article 1. To have a pure election I believe is the phraseology used.

The lower court went on to observe:

> It does seem that public money is being used for a private purpose. We have millions of dollars, extra millions being spent by the Secretary of State in an effort to garner this information at public expense for the sole use of individual parties. And the purpose of the law that was passed here was to have the primary, not to garner private —public information for private use only.
>
> It is my view that there is clear injury to the public's interest and the interests of these parties. I also feel that the individuals in this case will be likely to prevail in this lawsuit. They have standing.

The parties incorporated the lower court's ruling into the November 9 order that determined 2007 PA 52 unconstitutional as a matter of law and restrained and enjoined the Secretary of State and her agents from conducting the January 15, 2008, presidential primary election.

### III. THE USE OF PUBLIC PROPERTY FOR PRIVATE PURPOSES

#### A. STANDARD OF REVIEW

This Court reviews the grant or denial of a temporary or preliminary injunction for an abuse of discretion.[19] An abuse of discretion occurs when a lower court's decision is not within the range of reasonable and principled outcomes.[20] An abuse of discretion may also arise from a court's misunderstanding of controlling legal principles.[21] This Court reviews de novo challenges to the constitutionality of a statute.[22]

---

[19] *Hiers v Detroit Superintendent of Schools*, 376 Mich 225, 234; 136 NW2d 10 (1965); *Detroit Pub Works Dep't v Local 77, AFSCME*, 34 Mich App 159, 160; 190 NW2d 700 (1971).

[20] *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

[21] *East Lansing v Dep't of State Police*, 269 Mich App 333, 335; 712 NW2d 519 (2005).

[22] *Morreale v Dep't of Community Health*, 272 Mich App 402, 405; 726 NW2d 438 (2006).

### B. LEGAL STANDARDS FOR INJUNCTIVE RELIEF

A temporary or preliminary injunction is extraordinary relief and " 'should issue only in extraordinary circumstances.' "[23] A four-factor analysis determines the issuance of this extraordinary relief:

> [H]arm to the public interest if an injunction issues; whether harm to the applicant in the absence of a stay outweighs the harm to the opposing party if a stay is granted; the strength of the applicant's demonstration that the applicant is likely to prevail on the merits; and demonstration that the applicant will suffer irreparable injury if a preliminary injunction is not granted. This inquiry often includes the consideration of whether an adequate legal remedy is available to the applicant.[24]

The plaintiffs have the burden of proof on each of these factors,[25] and if the plaintiffs do not meet this burden with regard to any one factor, then injunctive relief should not be granted.

### C. INTERPRETING STATUTES AND THE CONSTITUTION

This Court is to presume a *statute* is constitutional and construe it as such, unless the only proper construction would render the statute unconstitutional.[26] This Court is to avoid an interpretation that creates a constitutional invalidity.[27] In *People v Antkoviak*, this Court outlined

---

[23] *Michigan Coalition of State Employee Unions v Civil Service Comm*, 465 Mich 212, 225 n 11; 634 NW2d 692 (2001), quoting *Michigan State Employees Ass'n v Dept of Mental Health*, 421 Mich 152, 166; 365 NW2d 93 (1984).

[24] *Michigan State Employees Ass'n, supra* at 157-158 (internal citation omitted).

[25] MCR 3.310(A)(4).

[26] *In re Petition by Wayne Co Treasurer*, 478 Mich 1, 9; 732 NW2d 458 (2007).

[27] *Traverse City School Dist v Attorney General*, 384 Mich 390, 406; 185 NW2d 9 (1971).

the method that this Court uses when construing a *constitutional* provision:

> When interpreting [a provision of the Michigan Constitution], this Court's primary duty is to ascertain the provision's purpose and intent. By intent, we mean the intent of the people who adopted the constitutional provision at issue. As a result, our interpretation should reflect the meaning that the people themselves would apply. The clearest way to ascertain this meaning is to look at the text's "natural, common, and most obvious meaning, strictly construed and limited to the objects fairly within its terms, as gathered both from the section of which it forms a part and a general purview of the whole context."[28]

### D. AN "APPROPRIATION BILL"

The first question I address is whether the act is an "appropriation bill." I would conclude that it is. As the Secretary of State points out, the very next section of the constitution provides that "[a]ny bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill."[29] The act itself provides that if a presidential primary is held, the state *shall* reimburse local units of government for the cost of conducting the primary and that "[t]he Legislature *shall* appropriate from the general fund of this state an amount necessary to implement this section."[30] Reading the constitution and the act together, I would conclude that the act is an appropriation bill because it requires an appropriation to carry out its purposes.

### E. "PUBLIC MONEY"

The conclusion that the act is an appropriation bill

---

[28] *People v Antkoviak*, 242 Mich App 424, 435-436; 619 NW2d 18 (2000) (internal citations omitted).

[29] Const 1963, art 4, § 31.

[30] 2007 PA 52, § 624g(3) (emphasis added).

does not, however, settle the matter. The second question I address is whether the act contains an "appropriation" of "public money." I would conclude that it does not. While, as I note above, the act requires the appropriation of public money for reimbursing local units of government for the cost of conducting the primary, there is no actual "appropriation" of public money in the act. In other words, even though the act is by constitutional definition an appropriation bill, it does not contain any "appropriation" of any specific amount of "public money."

I note that there is some confusion about the nature and amount of any "public money" involved here. The Secretary of State asserts, on the basis of a Senate Fiscal Agency analysis, that the estimated cost of holding a two-party presidential primary is approximately $10 million. However, according to the Secretary of State, this is not a new cost imposed by *this* act, because preexisting law also provided for the holding of a presidential primary in February 2008 rather than January 2008.[31] Rather clearly, then, the expenditure of this $10 million for a presidential primary in 2008 could not be an "appropriation of public money" that *this* act contained, because preexisting law already obligated the state to expend these funds.

But there is also the cost of implementing and maintaining the qualified voter file. As I noted above, the Grebner plaintiffs alleged in their complaint that the qualified voter file "was funded at a public expense of millions of dollars, and is maintained by public employees." It is possible that it was to this expenditure of public monies that the lower court referred when it stated that "[w]e have millions of dollars, extra millions

[31] MCL 168.613a(1).

being spent by the Secretary of State in an effort to garner this information at public expense for the sole use of individual parties."

If, in fact, the lower court was referring to the ongoing cost of implementing and maintaining the qualified voter file as an appropriation of public money under the act, such a reference was completely erroneous. As I noted above, the Legislature directed the Secretary of State to create and maintain the qualified voter file over 10 years ago.[32] Thus, the expenditure of public money for implementing and maintaining the qualified voter file is an ongoing cost to the state and rather clearly could not be an "appropriation of public money" that *this* act contained.

I suspect, however, that the lower court was not speaking of the ongoing cost of implementing and maintaining the qualified voter file when it referred to "extra millions being spent by the Secretary of State in an effort to garner this information at public expense . . . ." Rather, I suspect that the lower court was referring to the expenditure of public money for (1) the city and township clerks to keep a separate record at the presidential primary that contains the printed name, address, and qualified voter file number of each elector and the participating political party ballot selected by that elector at the presidential primary, and (2) the compiling of that information by the Secretary of State so as to provide the chairperson of each participating political party a file of the record for each participating political party as kept and submitted by the local clerks. In short, I suspect that that the lower court was referring to the expenditure of public money for the cost of compiling and providing the lists.

---

[32] MCL 168.509*o*.

The Secretary of State concedes that there would be some costs incurred at the local level by the clerks who initially collect the data. The Secretary of State further concedes that there would be additional costs involved in making an additional data entry in the qualified data file with respect to the party ballot information and in generating a list from the qualified voter file to supply to the party chairpersons. However, she asserts that these costs would be nominal. In light of the record before us, this Court has no basis on which to make an estimate of these costs. Regardless of the amount, however, if these costs are an appropriation of public money and if the act contained that appropriation of public money, then Const 1963, art 4, § 30 requires a two-thirds vote of both houses of the Legislature. All parties concede that the Legislature did not pass the act with two-thirds majorities.

I note, in passing, that there is some caselaw that deals with the appropriation of public monies. In *Michigan United Conservation Clubs v Secretary of State (After Remand)*, the Supreme Court dealt with the question whether 2000 PA 381 was exempt from the power of referendum of the Michigan Constitution.[33] Justice YOUNG, in his concurrence, noted that the Michigan Constitution speaks of "general appropriation bills."[34] He also noted that the Michigan Constitution "also explicitly recognizes a nonbudgetary form of appropriation acts, those that appropriate public money for local or private purposes."[35] According to Justice YOUNG, "The point is, the constitution does not pur-

[33] *Michigan United Conservation Clubs v Secretary of State (After Remand)*, 464 Mich 359, 365; 630 NW2d 297 (2001).

[34] *Id.* at 383, citing Const 1963, art 4, § 31.

[35] *Id.* at 385 n 20, citing Const 1963, art 4, § 30.

port . . . to limit or define legislation that makes an appropriation as only those acts that concern general appropriations."[36]

The act is not a general appropriation bill. If, however, it were to contain an appropriation of public money it would be, in Justice YOUNG's parlance, a nonbudgetary form of appropriation act, but an appropriation act nonetheless. 2000 PA 381 stated that "[o]ne million dollars is appropriated from the general fund to the department of state police[.]"[37] However, *this* act contains *no* specific appropriation of any kind. While it *requires the* appropriation of public money for reimbursing local units of government for the cost of conducting the primary and *requires* the Legislature to appropriate amounts from the general fund necessary to implement an enumerated section, it does not *appropriate* these amounts, whether these amounts are in the millions of dollars as the lower court appeared to have assumed or are nominal as the Secretary of State asserts. Under either possibility, the act simply does not contain an appropriation of public money.

### F. "PUBLIC PROPERTY"

#### (1) INTRODUCTION

Again, however, the conclusion that the act does not contain an appropriation of public money does not settle the matter. The third question I address is whether the act contains an "appropriation" of "public property." I would conclude that it does.

Preliminarily, I assume that, when read in context, use of the coordinating conjunction "or" in the phrase

---

[36] *Id.*

[37] 2000 PA 381, § 5w(1); see also MCL 28.425w(1).

"public money or property" in Const 1963, art 4, § 30 means that the adjective "public" describes not only the noun "money" but also the noun "property." I also assume that the term "appropriation" is broad enough to include not only a *nonbudgetary* appropriation but also a *nonmonetary* appropriation. A review of several dictionaries' definitions of the terms "appropriation" and "appropriate" supports this assumption.[38]

"Appropriation" is defined, in relevant part, as follows: "1. the act of appropriating. 2. anything appropriated for a special purpose, esp. money authorized to be paid from a public treasury";[39] "a sum of money, or any other thing, set apart for a given purpose; as, an *appropriation* for street paving; an *appropriation* for schools";[40] "[s]omething appropriated, esp. public funds set aside for a specific purpose."[41] Similarly, "appropriate" is defined, in relevant part, as follows: "to set apart for a specific purpose or use: *to appropriate funds for an environmental study*";[42] "to set apart for, or assign to, a particular use, in exclusion of all other uses; as, a spot of ground is *appropriated* for a garden; money is *appropriated* by Congress for public buildings";[43] "[t]o set apart for a specific use: *appropriating funds for educa-*

---

[38] See *Syntex Laboratories, Inc v Dep't of Treasury*, 188 Mich App 383, 386; 470 NW2d 665 (1991) (stating that resort to dictionary definitions is appropriate when interpreting a constitutional provision); see also *id.* at 388 ("[N]o word should be treated as surplusage or rendered nugatory if at all possible.").

[39] *Random House Webster's College Dictionary* (1977), p 66.

[40] *Webster's New Twentieth Century Dictionary: Unabridged 2d Edition* (1979), pp 91-92 (emphasis in original).

[41] *The American Heritage Dictionary,* 2d College Ed (1985), p 122.

[42] *Random House Webster's College Dictionary* (1997), p 66 (emphasis in original).

[43] *Webster's New Twentieth Century Dictionary: Unabridged 2d Edition* (1979), p 91 (emphasis in original).

*tion*";[44] "to give to a particular person or organization for a specific purpose[.]"[45] Most notably, Black's Law Dictionary, defines "appropriate" as "to designate or destine a fund or property for a distinct use . . . . Also used in the sense to distribute."[46]

I note that, typically, one does not think of *property* as being appropriated. Almost exclusively in the legislative process, the Legislature appropriates *money* and, most frequently (although not in all cases, as I point out above), it does so in general appropriations bills. However, here, the Legislature has rather clearly designated *property*, a matter to which I devote greater attention below, in the form of the lists. And the Legislature has designated that property for a particular *use*: participating political parties and persons with whom they contract may use the lists to support political party activities, including, without limitation, supporting or opposing candidates and ballot proposals. Further, under the act the Secretary of State is to *distribute* the lists to the participating political parties.

### (2) THE CONCEPT OF PROPERTY

Against this background, I address more thoroughly the question whether the lists are property. I would conclude that they are. Again, Black's Law Dictionary is helpful. It defines "property" as a term that is said to "extend to every species of valuable right and interest. More specifically, ownership; the unrestricted and exclusive right to a thing; the right to dispose of a thing in every legal way . . . . The word is also commonly used to denote everything which is the subject of ownership . . .

---

[44] *The American Heritage Dictionary*, 2d College Ed (1985), p 122 (emphasis in original).

[45] Garner, *A Dictionary of Modern Legal Usage* (2d ed, 1995), p 70.

[46] Black's Law Dictionary (5th ed) (1979), p 93.

tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value . . . . It extends to every species of valuable right and interest[.]"[47]

The parties, to differing extents and in differing fashions, appear to agree that the lists are property. The parties disagree, however, regarding the value of the lists, with the Secretary of State asserting that they have little, if any, value and the Grebner plaintiffs asserting that they have considerable value. In my view, however, the precise value of the lists is irrelevant, as long as they have even a nominal value. Further, the lists are property regardless of the label—be it a "chattel" or personal property or intellectual property—that may be attached to them, with one exception: the lists must be "public" property.

(3) THE PUBLIC CHARACTER OF THE PROPERTY

Above, I have assumed that the adjective "public" describes both the noun "money" *and* the noun "property" in Const 1963, art 4, § 30. I therefore consider whether the lists are public property. I would conclude that they are.

The Secretary of State asserts that after the local units of government transfer the lists to the Secretary of State and the information therein is then incorporated into the qualified voter file, the information "arguably" qualifies as a public record of the state. However, the Secretary of State contends that the lists

---

[47] Black's Law Dictionary (5th ed, 1979), p 1095. See also Garner, *A Dictionary of Modern Legal Usage* (2d ed, 1995), p 704 ("The traditional legal meaning of the term is 'a right over a determinate thing, either a tract of land or a chattel.' The transferred sense that nonlawyers commonly attach to the term is 'any external thing over which the rights of possession, use, and enjoyment are exercised.' ").

are transformed into a "non-public" record by the act's exemption from disclosure of the information indicating which participating political party ballot an elector selected.[48] More specifically, the Secretary of State argues that "[t]he Legislature's intent to accord the list information something less than 'public record' status undercuts the argument that the information is nevertheless 'public property' for purposes of art 4, § 30." I disagree that the lists' exemption from public disclosure negates their status as public property.

With respect to the lists' status as a "public record," I note that the act requires city and township clerks to keep "a separate *record* at a presidential primary that contains the printed name, address, and qualified voter file number of each elector and the participating political party ballot selected by that elector at the presidential primary."[49] Clearly, therefore, the lists are "records" created locally and then transmitted to the Secretary of State. Under the definition contained in the Freedom of Information Act, the lists are also clearly "public records."[50] But the fact that the act exempts these records from disclosure under the Freedom of Information Act[51] does not mean that they lose their status as public records. Indeed, the Freedom of Information Act specifies that *all* "public records" are separated into two classes: "[t]hose that are exempt from disclosure" and those "that are not exempt from disclosure[.]"[52] Therefore, public records exempt from disclosure are

---

[48] See 2007 PA 52, § 615c(4).

[49] 2007 PA 52, § 615c(3) (emphasis added).

[50] MCL 15.232(e) (A "public record" is "a writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function, from the time it is created.").

[51] 2007 PA 52, § 615c(4).

[52] MCL 15.232(e)(i) and (ii), citing MCL 15.243.

simply a particular class of public records; they are not transmuted into something other than a public record simply because they are protected from public disclosure.

It is a short step from the conclusion that the lists are public records, albeit exempt from disclosure, to the conclusion that they are public property for the purposes of Const 1963, art 4, § 30. In the absence of caselaw to the contrary, I am prepared to take that step. I would conclude, therefore, that the lists are "public property" as that term is used in Const 1963, art 4, § 30.

### G. "PRIVATE PURPOSES"

#### (1) INTRODUCTION

The last question I address is whether the act appropriates public property for local or private purposes. I would conclude that it does not. As I noted above, the act broadly allows a participating political party to "support political party activities" and then enumerates, without limitation, two particular activities: "support for or opposition to [1] candidates and [2] ballot proposals."[53] In *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10)*,[54] the Michigan Supreme Court dealt with a number of certified questions concerning the constitutionality of the political reform act, 1975 PA 227. One certified question dealt with public financing of gubernatorial elections.[55] The challenge to the provision of the political reform act covering such public financing[56] was whether this provision

---

[53] 2007 PA 52, § 615c(8).

[54] *Advisory Opinion on Constitutionality of 1975 P.A 227 (Questions 2-10)*, 396 Mich 465; 242 NW2d 3 (1976).

[55] *Advisory Opinion, supra* at 495-502.

[56] MCL 169.101, repealed by 1980 PA 180.

violated Const 1963, art 4, § 30.[57] Much as is the situation here, the Supreme Court noted:

> Since the act was enacted upon a vote of less than two-thirds of the members of each house, and since we have concluded that § 101 is an appropriations bill in our discussion of certified question VI, the only remaining question is whether § 101 constitutes an appropriation for private purposes. If it is such an appropriation, § 101 is invalid under art 4, § 30.[58]

The Supreme Court then gave considerable guidance regarding how to interpret public purposes versus private purposes. Interestingly, without explicitly saying so, the Supreme Court appeared to conclude that if a particular piece of legislation has a public purpose or more than one public purpose, by definition it is not for a private purpose. As the Supreme Court noted:

> The fact that certain individuals benefit from the appropriation does not necessarily imply that the appropriation is lacking a public purpose. The question is whether society at large has an interest in having those individuals benefited.[59]

Further, the Supreme Court instructed:

> [I]t should be recognized that the term public purpose should not be narrowly construed by the courts, for the determination of what constitutes a public purpose for which an appropriation of public money may be made is primarily the responsibility of the Legislature.

> As stated in *Gregory Marina, Inc v Detroit*, 378 Mich 364, 394; 144 NW2d 503 (1966):

> "[D]etermination of what constitutes a public purpose involves considerations of economic and social philosophies

---

[57] *Advisory Opinion, supra* at 495.

[58] *Id.*

[59] *Id.* at 496 (citation omitted).

and principles of political science and government. Such determinations should be made by the elected representatives of the people."[60]

The Supreme Court went on to conclude:

[T]he Michigan Legislature has determined that public financing of gubernatorial elections is for the general welfare of the public, and it is well within the Legislature's powers to so determine.[61]

The lessons that I derive from *Advisory Opinion* are threefold. First, the term "public purpose" is to be broadly construed; conversely, the term "private purpose" is to be narrowly construed.[62] Second, determinations of public purpose are primarily the obligation of the Legislature, and the courts should accord considerable deference to those determinations. Third, even though private individuals may benefit from a given appropriation—whether it is money, as was the case in *Advisory Opinion*, or property, as is the case here—the basic question is whether society at large has an interest in having those individuals benefited.

### (2) CONFERRING A BENEFIT

Here, amicus curiae Michigan Republican Party argues that the public purpose of the act is that Michigan

---

[60] *Id.* at 495-496.

[61] *Id.* at 497.

[62] See, e.g., *Gaylord v Gaylord City Clerk*, 378 Mich 273, 297; 144 NW2d 460 (1966) (Michigan industrial aid financing program involving the issuance of bonds to finance the construction of private industrial plants had a public purpose); *Hays v City of Kalamazoo*, 316 Mich 443; 25 NW2d 787 (1947) (expenditure of general funds of a city for membership in the Michigan Municipal League, a private nonprofit corporation established to advise and lobby for cites and villages in the state, upheld as being for a public purpose); *Miller v Michigan State Apple Comm*, 296 Mich 248; 296 NW 245 (1941) (state tax on apples used primarily to promote the sale of Michigan apples upheld because stimulation of Michigan's apple industry would be beneficially reflected throughout the state).

will be able to offer its citizens the opportunity to participate in the 2008 presidential primary. While this may very well be a laudable purpose, it is not the issue here. The only reason that the question of holding a 2008 presidential primary in January 2008, rather than in February 2008 as would occur under preexisting law,[63] is before this Court is that the Legislature determined that the provisions of the act were to be nonseverable.[64]

Rather, the issue here is whether compiling the lists and turning them over to the chairpersons of the participating political parties is an appropriation of public property for private purposes. Here, I note that Const 1963, art 4, § 30 was drawn from Const 1908, art 5, § 24 and, as the Secretary of State points out, there are relatively few decisions analyzing either of the two provisions. The official record of the constitutional convention shows that it was recommended that this provision be retained because:

> It provides against the possible misuse of the appropriation power for private gain.
>
> The committee believes that a ⅔ vote of the members of each house of the legislature should be required for any bill appropriating public money or property for nongovernmental or nonpublic purposes, thereby protecting public funds.[65]

Here, the Secretary of State concedes that both the chairpersons of the participating political parties and the participating political parties themselves are private persons or entities. Indeed, in *Ferency v Secretary of State*, this Court recognized that, although state primaries are run by the state and regulated by state

---

[63] MCL 168.613a(1).

[64] See 2007 PA 52, enacting § 1.

[65] 1 Official Record, Constitutional Convention 1961, p 837.

election law, they are primarily party functions of the private political parties choosing to participate in the primary process.[66] The Secretary of State contends, however, that this is not the relevant inquiry, and I agree, albeit for different reasons.

In my view, compiling the lists and turning them over to the chairpersons of the participating political parties serves a number of purposes, some of which are private and some of which are public. Supporting political party activities, for example, would appear to involve the use of the lists for a private purpose. While there can be considerable debate regarding whether an electoral system that basically relies on two parties—or on parties at all—is a good or a bad idea, the Secretary of State virtually conceded this point when she agreed that the participating political parties are private entities.

This does not mean, however, that *every* use to which the political parties may put the lists is a private use. The act specifically allows the use of the lists to support or oppose candidates, and this is a *public* purpose. Indeed, as the United States Supreme Court said in *Buckley v Valeo*, "[d]iscussion of public issues and *debate on the qualifications of candidates* are integral to the operation of the system of government established by our Constitution."[67] Further, as the United States Supreme Court also said, political expression must be afforded the broadest protection in order " 'to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]' "[68] "[T]he ability of the

---

[66] *Ferency v Secretary of State*, 190 Mich App 398, 416-417; 476 NW2d 417 (1991), vacated in part on other grounds 439 Mich 1021 (1992).

[67] *Buckley v Valeo*, 424 US 1, 14; 96 S Ct 612; 46 L Ed 2d 659 (1976) (emphasis added).

[68] *Monitor Patriot Co v Roy*, 401 US 265, 272; 91 S Ct 621; 28 L Ed 2d 35 (1971), quoting *Roth v United States*, 354 US 476, 484; 77 S Ct 1304; 1 L Ed 2d 1498 (1957).

citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation."[69]

And even more directly, the act also specifically allows the use of the lists to support or oppose ballot proposals. As with contributions and expenditures by corporations, the participating political parties' use of the lists will "serve to enlighten the public and encourage an informed decision-making process."[70] Thus, while the lists may be used for private purposes, they may also be used for public purposes.

In this regard I note that the government conducts elections while the political parties and their candidates conduct campaigns. While it is possible to conceive of elections without campaigns, the reality is that the two are inseparable in almost every instance of political life in this country and in this state. Clearly, the United State Supreme Court has recognized that the discussion of public issues and debate on the qualifications of candidates is absolutely integral to our system of government. Therefore, while supporting political party activities may serve the private purposes of those parties, such support also serves a public purpose. More directly, however, the support of or opposition to candidates and the support of or opposition to ballot proposals primarily serve a public purpose.

### (3) CONCLUSION

This Court should be mindful of its obligation to presume a statute to be constitutional and to construe it as such while avoiding an interpretation that would ren-

---

[69] *Buckley*, *supra* at 14-15.

[70] *Advisory Opinion*, *supra* at 494.

der the statute unconstitutional. This Court should also be mindful of the approach that *Advisory Opinion* outlines. Construing the term "public purpose" broadly, I would conclude that the use of the lists to support or oppose candidates and to support or oppose ballot proposals serves a public purpose. Construing the term "private purpose" narrowly, I would conclude that merely because some uses of the lists can be for private purposes, this does not mean that *all* uses of the lists are for such purposes. In coming to these conclusions, I suggest that this Court recognize that determinations of public purpose are primarily the obligation of the Legislature and this Court should accord considerable deference to those determinations. Finally, I would conclude that while private entities —here, the participating political parties—may benefit from the use of the lists, society at large has an interest in having those entities benefited because debate on the qualifications of candidates is integral to the operation of our system of government and because discussion of ballot proposals serves to enlighten the public and encourage an informed decision-making process.

### IV. PURITY OF ELECTIONS

As I stated previously, the lower court also concluded that the act violated the Purity of Elections Clause, which states, in pertinent part:

> The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, [and] to guard against abuses of the elective franchise[.][71]

The Grebner plaintiffs argue that the act violates the Purity of Elections Clause by transferring the lists to the sole possession of the participating political parties, thereby subjecting every candidate to the "unrestrained

---

[71] Const 1963, art 2, § 4.

coercion" of the two participating major political parties and inevitably distorting the political process in favor of those parties' favored candidates. I disagree.

I am cognizant that " 'one of the primary goals of election procedures is to achieve equality of treatment for all candidates whose names appear upon the ballot.' "[72] However, this Court has previously stated that "the state's interest in the stability of its political systems permits it 'to enact reasonable election regulations that may, in practice, favor the traditional two-party system.' "[73] Further, " 'while an interest in securing the perceived benefits of a stable two-party system will not justify unreasonably exclusionary restrictions, ... [s]tates need not remove all of the many hurdles third parties face in the American political arena today.' "[74] Here, the Grebner plaintiffs present nothing but speculation and conjecture to argue that the participating political parties would use the lists to disadvantage any candidate. In other words, the Grebner plaintiffs present nothing to support a conclusion that the act's provision requiring the transfer of the lists to the two major participating political parties presents an unreasonably exclusionary restriction.

### V. CONCLUSION

I would conclude that although the act is an "appropriation bill," the act does not contain an appropriation of public money. And, although I would conclude that the act contains an appropriation of public property, I

---

[72] *McDonald v Grand Traverse Co Election Comm*, 255 Mich App 674, 694; 662 NW2d 804 (2003), quoting *Wells v Kent Co Bd of Election Comm'rs*, 382 Mich 112, 123; 168 NW2d 222 (1969).

[73] *Id.* at 687, quoting *Timmons v Twin Cities Area New Party*, 520 US 351, 367; 117 S Ct 1364; 137 L Ed 2d 589 (1997).

[74] *Id.* at 687-688, quoting *Timmons, supra* at 367 (citation omitted).

cannot conclude that the act contains an appropriation of such property for private purposes. I would further conclude that the act does not affect the purity of elections. I would review the constitutional issues here de novo. On the basis of this review, I would conclude that the lower court misunderstood the controlling legal principles in this case and that the lower court's decision was not within the range of reasonable and principled outcomes. Accordingly, I would conclude that the lower court's issuance of a preliminary injunction was an abuse of discretion, and I would therefore vacate the lower court's November 9, 2007, order. Because they are moot, I would deny the Secretary of State's motion for stay, application for leave to appeal, and motion to waive the requirements of MCR 7.209(A)(2) and (3).

Accordingly, I respectfully dissent.